## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

NORMAN LARY,           )
                                  )
     Plaintiff,          )
                                  )
v.                        )
                                  )
VIC REGALADO, in his official capacity as  )     Case No. 25-cv-00520-SH
Tulsa County Sheriff; TURN KEY       )
HEALTH CLINICS, LLC; ANDREW    )
SKOUSEN, DNP; and SARAH        )
SCHUMACHER, LPN,          )
                                  )
     Defendants.       )

## OPINION AND ORDER

Before the Court are Defendants' motions to dismiss.[1]  Plaintiff, a former county jail inmate, alleges that the jail, its contractual medical provider, and two nurses violated his Fourteenth Amendment rights.  Plaintiff alleges a terrible sequence of events that led to the partial amputation of his leg.  What he does not allege, however, is facts showing the individual defendants' deliberate indifference to his medical needs, or showing how the institutional defendants' policies caused a constitutional deprivation.  The Court will grant the motions to dismiss and allow Plaintiff an opportunity to amend his complaint.

### Factual Background

Accepting the factual allegations in the complaint[2] as true, and viewing them in the light most favorable to the nonmoving party, Plaintiff alleges as follows:

---

[1] The parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes under 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(a).  (Dkt. No. 27.)

[2] The operative complaint is Plaintiff's "Amended Petition," filed August 19, 2025.  (Dkt. No. 2-2.)

On July 6, 2023, Plaintiff Norman Lary ("Lary"), a 66-year-old man, was booked into the Tulsa County Jail ("the jail"). (Dkt. No. 2-2 ¶¶ 9–10.) Defendant Vic Regalado ("Regalado") is Sheriff of Tulsa County and was responsible for promulgating and enforcing policies at the jail. (*Id.* ¶ 2.) Defendant Turn Key Health Clinics, LLC ("Turn Key") is a private correctional healthcare company. (*Id.* ¶ 3.) Turn Key contracted with Tulsa County to provide professional staffing, supervision, and care for inmates in the jail. (*Id.*)

On the evening of his booking, a Turn Key nurse conducted Lary's medical intake. (*Id.* ¶ 11.) Lary suffered from neuropathy in his legs and had trouble walking at the time. (*Id.* ¶ 10.) The nurse noted that Lary was "frail or elderly" and suffered from "nerve damages in [his] legs," but indicated that his blood pressure and pulse were normal; that he was in "stable condition"; and that he could be housed in general population in a lower-level bunk. (*Id.* ¶¶ 11–13.) The nurse scheduled Lary for a chronic care evaluation with Defendant Andrew Skousen, a Turn Key nurse practitioner ("Skousen").[3] (*Id.* ¶ 14.) The intake nurse also scheduled Lary for a mental health screening. (*Id.*)

On July 12, 2023, Skousen conducted the chronic care evaluation. (*Id.* ¶ 15.) Lary reported to Skousen that he had a history of neuropathy in his lower extremities resulting from a history of diabetes. (*Id.* ¶ 16.) He requested ibuprofen for the neuropathy pain. (*Id.*) Lary also told Skousen that he was under the care of a specialist for his neuropathy and was due for a "procedure" on his left leg. (*Id.*) Skousen observed that Plaintiff seemed fatigued and had difficulty walking, but when Skousen performed a "foot exam" it revealed "no abnormal findings." (*Id.* ¶¶ 17–18.) Skousen similarly found no

---

[3] Skousen has a Doctor of Nursing Practice degree, or DNP. (*Id.* ¶ 14.) The complaint does not state what sort of licensure Skousen carries.

abnormalities in Plaintiff's vitals and prescribed ibuprofen. (*Id.* ¶ 19 & n.6.) Skousen scheduled a follow-up evaluation for Lary in three months. (*Id.* ¶ 19.)

Later that day, Lary was seen by a licensed professional counselor for his mental health screening. (*Id.* ¶¶ 14, 20.) A detention officer asked the counselor to do the screening in Lary's cell rather than the medical unit, stating that Lary was capable of walking but was refusing to do so. (*Id.* ¶ 21 & n.7.) Lary told the counselor his neuropathy was causing difficulty adjusting to jail, and he requested a wheelchair. (*Id.* ¶ 22.) Following the mental health screening, the counselor found no significant issues and advised Lary to submit requests for follow-up care as needed. (*Id.* ¶ 23.) No one provided a wheelchair, or apparently any other assistive device, to Lary. (*Id.* ¶¶ 24–25.)

On the morning of July 14, 2023, Lary lost his balance and fell in his cell while walking to the restroom. (*Id.* ¶ 25.) He was unable to get off the floor due to limitations caused by his neuropathy. (*Id.* ¶ 26.) Lary eventually got the attention of a jail staff member, who called a medical emergency. (*Id.* ¶ 27.) Five Turn Key licensed practical nurses ("LPNs") responded, helping Lary back into his bed. (*Id.* ¶¶ 28–29.) Lary told the LPNs what happened and explained that he falls somewhat frequently due to his condition and needs help off the floor from time to time. (*Id.* ¶¶ 28, 30.) One LPN took Lary's vital signs, recording high blood pressure and high sitting pulse; the LPN also noted that Lary had been diagnosed with a seizure disorder. (*Id.* ¶¶ 31–32.) The LPN did not refer Lary to a physician, a higher-level provider, or any offsite medical provider for assessment, nor was he provided an assistive device. (*Id.* ¶¶ 33, 35.) The five LPNs told Lary to notify a pod officer if he had any pain or dizziness. (*Id.* ¶ 34.)

Sometime between the afternoon of July 15, and the morning of July 16, 2023, Lary again fell on his way to the bathroom. (*Id.* ¶ 35.) His left foot struck his bedpost, and his

head hit the ground.  (*Id.*)  Lary was unable to get up, and he remained on the floor for a few hours.  (*Id.* ¶ 36.)  Lary eventually got the attention of a detention officer who, with the help of inmates, placed Lary back on his bunk.  (*Id.*)  The detention officer did not call for medical assistance or ensure that Lary was examined.  (*Id.* ¶ 37.)

Later on the morning of the 16th, Lary noticed that his left sock was bloody, and he discovered an open wound near his pinky toe.  (*Id.* ¶ 38.)  Lary alerted a detention officer, who called for medical.  (*Id.* ¶ 39.)  Defendant Skousen responded to the call, charting his response at 10:20 a.m.  (*Id.* ¶¶ 40–41.)  Skousen noted that Lary was a fall risk with left foot trauma, head trauma, and face trauma from previous falls.  (*Id.* ¶ 41.)  Skousen noted that Lary could not adequately care for himself, had soiled himself, and would be moved to a medical unit for closer observation.  (*Id.*)  Skousen did not take Lary's vital signs.  (*Id.* ¶ 43.)  Skousen scheduled an ultrasound of Lary's leg for July 16, and an x-ray of his left foot for July 17, 2023.  (*Id.* ¶ 42.)  Neither test occurred as scheduled.  (*Id.*)

At 10:44 a.m., a Turn Key LPN responded to Lary's cell following a call regarding "patient weakness."  (*Id.* ¶ 44.)  The LPN similarly noted Lary's open wound (along with swelling and bruising) on his left foot, his facial and head bruising, and the smell of urine.  (*Id.* ¶¶ 45–46.)  Lary told the LPN he had fallen multiple times since July 14th while trying to go to the bathroom.  (*Id.* ¶ 46.)  The LPN followed Skousen's order and transferred Lary to the medical unit.  (*Id.* ¶ 47.)  Once Lary arrived in the medical unit, the LPN cleaned his foot.  (*Id.* ¶ 48.)  She did not take his vitals.  (*Id.*)

In the medical unit, Lary was seen by Turn Key nurses at 7:38 p.m. and 11:12 p.m. on July 16, 2023, and again at 6:07 a.m. and 7:17 a.m. on July 17, 2023.  (*Id.* ¶¶ 49–52.)  During the 7:38 p.m. visit, the nurse charted that no referral was needed.  (*Id.* ¶ 49.)  At 11:12 p.m., the nurse recorded an elevated blood pressure.  (*Id.* ¶ 50.)  At 6:07 a.m., the

nurse noted Lary was doing fine.  (*Id.* ¶ 51.)  And at 7:17 a.m., the nurse charted that no referral needed.  (*Id.* ¶ 52.)  There is no indication the nurses examined, cleaned, or dressed Lary's foot.  (*Id.* ¶ 53.)

On July 17, 2023, at 6:06 p.m., Defendant Sarah Schumacher, a Turn Key LPN ("Schumacher"), saw Lary.  (*Id.* ¶ 54.)  She and another individual removed Lary's old dressing, assisted him with showering, and cleaned and re-dressed his wound. (*Id.*)  This was the first time Lary's foot had been cleaned, dressed, or examined in roughly 32 hours.  (*Id.* ¶ 55.)  Schumacher also completed a wound care assessment, describing Lary's wound as Stage II.  (*Id.* ¶ 56.)  Schumacher noted the presence of slough in the wound bed, which Plaintiff indicates is a yellow/white layer of dead skin tissue that can prevent or slow down healing.  (*Id.* ¶ 56 & n.12.)  Schumacher further noticed a moderate amount of foul-smelling drainage.  (*Id.* ¶ 57.)  Schumacher did not take Lary's temperature or vitals, and she did not refer Lary to a physician, higher-level provider, or an offsite medical provider.  (*Id.* ¶¶ 58–59.)

Lary was later seen by additional Turn Key nurses at 7:21 p.m. on July 17, 2023, and at 7:40 a.m. on July 18, 2023.  (*Id.* ¶¶ 60–61.)  At 7:21 p.m., the nurse noted Lary was alert, in no distress, and not in need of a referral.  (*Id.* ¶ 60.)  At 7:40 a.m., the nurse noted no referral was needed.  (*Id.* ¶ 61.)  Neither nurse observed, sanitized, or examined Lary's foot or took his vital signs.  (*Id.* ¶ 62.)

Lary's condition continued to deteriorate.  (*Id.* ¶ 63.)  By the afternoon of the 18th,[4] his wound was obviously necrotic and clearly infected.  (*Id.*)  On July 18, 2023, at 2:39 p.m., Schumacher called Skousen, telling him that she was concerned Lary had contracted

---

[4] The complaint says "July 17, 2023," but given the chronological nature of the allegations, this appears to be a scrivener's error.

5

sepsis and had possible necrosis of the fourth and fifth metatarsals. (*Id.* ¶ 64.) Skousen ordered Lary be transferred to an emergency room, and medical staff called an ambulance, advising that Lary needed to be sent to the ER for further evaluation and possible amputation. (*Id.* ¶ 65.) At 2:44 p.m., Lary's vital signs were taken for the first time in 32 hours, showing elevated blood pressure. (*Id.* ¶ 66.) Before leaving the jail, Lary was never medically assessed by a physician. (*Id.* ¶ 107.)

At 3:00 p.m., EMSA arrived at the jail. (*Id.* ¶ 67.) EMSA found Lary sitting in a wheelchair, with bandaging on his left foot and a small portion of his toes exposed with obvious necrosis. (*Id.*)

Lary arrived at the emergency room at 3:50 p.m. (*Id.* ¶ 68.) By 4:12 p.m., the ER resident noted that Lary's left fourth and fifth toes appeared black. (*Id.* ¶ 69.) At 4:44 p.m., an ER physician noted Lary was in moderate acute distress and his left fourth and fifth toes were obviously necrotic with evidence of infection. (*Id.* ¶ 70.) At 8:33 p.m., a podiatrist found Lary had gangrene in his left fourth and fifth toes with a large ischemic ulceration along the dorsal foot with associated cellulitis. (*Id.* ¶ 71.) The podiatrist opined that Lary would likely require major limb amputation given the extent of the infection and necrosis. (*Id.*)

The next evening, on July 19, 2023, the podiatrist noted Lary had worsening necrosis of the left foot and would require major limb amputation due to the level of tissue loss, extent of infection, and peripheral perfusion. (*Id.* ¶ 73.)

On July 22, 2023, a surgeon amputated Lary's left leg below the knee. (*Id.* ¶ 77.)

The complaint contains additional allegations regarding Turn Key and the jail, which are discussed in section IV, *infra*.

## Procedural Background

Lary asserts that the defendants have violated 42 U.S.C. § 1983 by failing to provide medical care required by the Fourteenth Amendment. (*Id.* ¶¶ 171–203.) All four defendants have moved to dismiss.

Defendants Skousen and Schumacher argue Lary has failed to allege they were deliberately indifferent to his serious medical needs. (Dkt. No. 23 at 7–10; Dkt. No. 24 at 7–8.[5]) Schumacher also argues that her alleged conduct was, at most, negligent. (Dkt. No. 24 at 8–9.)

Defendant Turn Key, meanwhile, argues (1) Lary has failed to sufficiently allege the existence of a Turn Key policy, custom, or practice that caused an underlying constitutional violation (Dkt. No. 22 at 13–18, 20–23); and (2) Lary has failed to allege sufficient facts to support liability based on a theory of failure to train or supervise (*id.* at 18–20). Similarly, Defendant Regalado argues Lary (1) has failed to plead an underlying constitutional violation (Dkt. No. 26 at 15–20); (2) has failed to plausibly allege the existence of a municipal policy or custom that was the moving force behind the alleged violation (*id.* at 20–22); (3) does not allege facts supporting liability for failure to train or supervise (*id.* at 22–25); (4) does not allege a systemic failure (*id.* at 25–26); and (5) may not recover punitive damages (*id.* at 26). The motions are now fully briefed and ready for decision.[6]

---

[5] Page numbers refer to those in the court-provided header.

[6] Lary has not responded to Skousen's motion to dismiss. Even so, "a district court may not grant a motion to dismiss for failure to state a claim merely because a party failed to file a response." *Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003) (citation modified). Instead, the court must "examine the allegations in the plaintiff's complaint and determine whether the plaintiff has stated a claim upon which relief can be granted." *Id.* at 1178.

## Analysis

### I.    Standard of Review

To survive a 12(b)(6) motion to dismiss, "a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citation modified); *see also Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013) (noting all reasonable inferences are resolved in the plaintiff's favor). Any legal conclusions must be supported by factual allegations. *Iqbal*, 556 U.S. at 679. This process is context-specific and requires the reviewing court to draw on its judicial experience and common sense. *Id.* As the Tenth Circuit has recently observed, surviving a 12(b)(6) motion to dismiss is a "low bar." *Griffith v. El Paso Cnty.*, 129 F.4th 790, 815 (10th Cir. 2025).[7]

---

[7] Applying these pleading standards does not violate the Supreme Court's prior holding that a federal court may not apply a "heightened pleading standard . . . more stringent than the usual requirements" of Fed. R. Civ. P. 8(a) in § 1983 municipal liability cases. *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993). As *Iqbal* made clear, plausibility is the "usual" requirement of Rule 8—"where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)). The Court, therefore, rejects any argument, based on the reasoning in *Thomas v. City of Galveston*, 800 F. Supp. 2d 826 (S.D. Tex. 2011), that there is a "laxed standard when reviewing municipal liability claims at the motion to dismiss stage." (*E.g.*, Dkt. No. 35 at 12.) This does not mean, however, that the Court requires the level of detail demanded by Defendants, which

## II.    The Court Will Not Consider Regalado's Additional Evidence

Before addressing the substance of the parties' arguments, the Court addresses Regalado's request that it review certain documents in addition to Lary's complaint and the parties' briefing.  Regalado attaches to his motion what he argues is "Plaintiff's [jail] medical record" and asks the Court to find it incorporated as part of Plaintiff's complaint. (Dkt. No. 26 at 9; Dkt. No. 26-1.)

When addressing a Rule 12(b)(6) motion, "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).  Even when a document is incorporated in the complaint, the Court should consider the nature of the document and why the complaint referenced it before assuming the <u>contents</u> of said document are true. *Mundt v. Gadziala*, No. 24-1041, 2024 WL 5087212, at *5 (10th Cir. Dec. 12, 2024) (unpublished) (citing *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016)).[8]  Here, Lary asserts he cannot verify that the record provided by Regalado is complete, accurate, or authentic. (Dkt. No. 37 at 15.)  He also argues: "Not infrequently in cases involving correctional medical care, discovery reveals that portions of official records are false, misleading or incomplete." (*Id.* at 15–16.)

---

approaches the Rule 9 particularity requirements rejected by *Leatherman*.  507 U.S. at 168.  As noted above, the Court will apply the context-specific, commonsense approach outlined by the Supreme Court—treating the facts alleged as true, drawing reasonable inferences in Plaintiff's favor, and accepting any legal conclusions supported by the factual allegations.

[8] Unpublished decisions are not precedential, but they may be cited for their persuasive value.  10th Cir. R. 32.1(A).

In these circumstances, consideration of the materials provided by Regalado is not appropriate. *See Crawford v. Turn Key Health Clinics, LLC*, No. 24-CV-6-JDR-SH, 2025 WL 1885637, at *3 (N.D. Okla. July 8, 2025) ("Medical records are not akin to a contract or insurance policy where there is no dispute as to the authenticity or accuracy of the document.").

### III.   Individual Liability—Schumacher and Skousen

The Court first addresses Lary's allegations of individual liability against Defendants Schumacher and Skousen.

#### A.   Deliberate Indifference Standard

An individual state actor's deliberate indifference to a pretrial detainee's serious medical needs violates the Fourteenth Amendment. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023). Deliberate indifference contains both an objective and subjective component. *Id.* In this case, Schumacher and Skousen only dispute whether the subjective component has been met. (Dkt. No. 23 at 7; Dkt. No. 24 at 7.)

The subjective component of deliberate indifference requires "that the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Lucas*, 58 F.4th at 1137 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Mere negligence or medical malpractice is not enough. *Self v. Crum*, 439 F.3d 1227, 1233 (10th Cir. 2006). A claim is "actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious." *Id.* at 1232.

This means the official must both be aware of the facts from which he could infer a substantial risk of serious harm and also draw that inference. *Lucas*, 58 F.4th at 1137. The plaintiff need not show the official failed to act believing the inmate would be harmed.

*Farmer*, 511 U.S. at 842.  It is enough that he "acted or failed to act despite his knowledge of a substantial risk of serious harm," *id.*, or that he "refused to verify underlying facts that he strongly suspected to be true," *Lucas*, 58 F.4th at 1137 (quoting *Farmer*, 511 U.S. at 843 n.8).  "An official disregards risk when he fails to take reasonable measures to abate the risk."  *Id.*  Conversely, "officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.

"Knowledge of a substantial risk is a question of fact and may be shown by circumstantial evidence."  *Buchanan v. Turn Key Health Clinics, LLC*, No. 22-7029, 2023 WL 6997404, at *4 (10th Cir. Oct. 24, 2023) (unpublished) (citation modified); *see also Farmer*, 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").  "[T]he symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference."  *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009).  "Circumstantial evidence of obviousness in a missed diagnosis or delayed referral appears in contexts including (1) recognition of inability to treat and still declining or unnecessarily delaying referral; (2) condition is so obvious a layman would recognize it; or (3) complete denial of care in the face of a medical emergency."  *Lucas*, 58 F.4th at 1139.

Generally, a plaintiff may satisfy the subjective component "under two theories: failure to properly treat a serious medical condition ('failure to properly treat theory') or as a gatekeeper who prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment ('gatekeeper theory')."  *Id.* at 1137.

The Court will consider Defendants' motions under this standard.

**B.      Schumacher**

Lary's allegations against Schumacher arise solely from their first interaction on July 17, 2023, when Schumacher cleaned and re-dressed Lary's wound.  (*Supra* at 5.) Lary alleges Schumacher failed as a gatekeeper when she was aware he had a Stage II wound that was exuding a moderate amount of foul-smelling drainage, but did not refer him to a higher-level provider or outside medical care.  (Dkt. No. 2-2 ¶¶ 175–176.)  Lary also argues, in passing, that Schumacher failed in her duty to properly treat his serious medical condition.  (Dkt. No. 36 at 11.)

### 1.      Lary Does Not Adequately Allege a Failure to Properly Treat

Despite Lary's brief refence to Schumacher's "duty to treat a serious medical condition" (*id.* (citation modified)), any assertion that Lary stated a failure-to-properly-treat claim fails.  July 17th was Schumacher's first interaction with Lary, and she removed his old wound dressing, assisted him with a shower, and cleaned and re-dressed his wound.  Lary does not argue this is the "functional equivalent of a complete denial of care" or treatment "with no reference to the underlying condition."  *Lucas*, 58 F.4th at 1139. Nor does Lary indicate what other treatment Schumacher could provide that would have been more appropriate or effective.  As such, Lary has not pled deliberate indifference by Schumacher on a theory of "failure to properly treat."

### 2.      Lary Does Not Adequately Allege a Failure under the Gatekeep Theory

The majority of Lary's substantive arguments relate to the gatekeeper theory.  But these arguments fail for a lack of essential underlying facts.

### a.    Gatekeeping, Generally

The gatekeeper theory can apply when a medical professional knows her role in a medical emergency is to refer the patient to another.  *Id.* at 1137.  The inquiry "is not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises."  *Id.* at 1139.  For instance, a "physician's role often involves treating the patient while simultaneously considering the need for referral to someone with more specialized training at the same time."  *Id.* at 1143.  A "nurse fulfills the gatekeeping role by promptly and accurately reporting an inmate's serious symptoms to a physician and following the physician's instructions."  *Buchanan*, 2023 WL 6997404, at *5.

Relevant here, "LPNs are gatekeepers to prisoners accessing appropriate medical care" and "do not have the authority to diagnose, so their role is to assess whether patients need care from a more qualified medical professional."  *Est. of Angelo v. Bd. of Cnty. Commissioners*, No. 1:23-CV-01607-CNS-STV, 2024 WL 2274080, at *9 (D. Colo. May 20, 2024).  As such, they "can be liable for providing minimal treatment for serious symptoms without referring the inmate to a more qualified provider."  *Id.*  In his complaint, Lary alleges that LPNs are qualified to record health history, administer medication, perform wound care, measure vital signs, and observe the patient's condition; they cannot, however, diagnose any medical condition or prescribe medication.  (Dkt. No. 2-2 ¶ 28 n.9.)

### b.    Lary Fails to Allege Essential Facts

Lary argues that allegations in the complaint show circumstantial evidence of the obvious need for referral based on Schumacher recognizing her inability to treat yet

unnecessarily delaying access to higher-level care.[9]  (Dkt. No. 36 at 12 (citing *Lucas*, 58 F.4th at 1139).)

To support this contention, Lary first argues that the condition of his foot 20 hours after Schumacher's examination provides "circumstantial evidence that [his] foot was obviously severe when" she examined him the day prior.  (*Id*. at 13.)  Lary asks the Court to draw "a plausible inference . . . that it was obvious that Plaintiff's foot was in a dire condition at the time of Nurse Schumacher's July 17, 2023 evaluation," because "a reasonable person could find that Plaintiff's toes did not just turn black in a matter of hours."  (*Id*. at 14.)  But this asks the Court to go beyond drawing inferences in his favor and, instead, asks it to add substantive facts to his complaint.

As pled, the complaint alleges that, on July 17th at 6:06 p.m., Schumacher conducted a wound care assessment on Lary, noting Lary's wound was Stage II with slough and a moderate amount of foul-smelling drainage.  Lary does not argue that this, alone, would normally require a referral to a higher-level medical provider such that Schumacher knew of and disregarded an excessive risk to his health or safety.  *See Lucas*, 58 F.4th at 1137.  So, Lary directs the Court's attention to July 18th at 2:39 p.m., when Schumacher thought Lary had sepsis and possible necrosis, and at 3:00 p.m., when EMSA confirmed that it was obvious necrosis.  From this, Lary appears to ask the Court to infer that Schumacher <u>must</u> have seen something more than what is described in the complaint, some sign of sepsis or necrosis.  But to do so, the Court would need more facts.

---

[9] Separately, Lary also argues it was obvious to a layperson that he needed emergent medical care that was not available at the jail. (Dkt. No. 36 at 2.) *See also Lucas*, 58 F.4th at 1139.  The Court treats this as part of his "inability to treat" argument.  That is, if it was obvious to a layperson that Lary needed emergency medical care, then there is circumstantial evidence Schumacher knew Lary had a condition she was unable to treat.

Was Lary's ultimate infection the type that takes more than 20 hours to manifest into necrosis? Is it medically uncommon for necrosis to develop that quickly without outward signs? Does Lary recall seeing his foot that day and noticing something else about its appearance? These are only examples of questions that currently prevent a logical leap from Lary's July 18th condition to the inference Lary asks the Court to make. Facts such as these may be available to Lary and are the sort that he could allege, if appropriate, in his complaint. The Court cannot, however, draw a reasonable inference by assuming facts not pled.

Second, Lary argues that it was obvious he needed medical assistance, because his condition was worsening. (Dkt. No. 36 at 14.)

On July 16th, Defendant Skousen ordered Lary transferred to the medical unit where an LPN cleaned his foot. The complaint contains no allegations as to the condition of Lary's foot at the time, other than that it was swollen and bruised with an open wound. Then, on July 17th, as noted above, Lary's foot began showing signs of infection. Lary cites *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1158 (10th Cir. 2022), for the proposition that a reasonable jury could find it obvious a detainee needs medical assistance when his condition is worsening. (*Id.*) But in *Paugh*, the official was specifically warned by a doctor to return the detainee to the hospital if his symptoms worsened. 47 F.4th at 1157. Lary points to no similar instructions in this case, nor does he provide any other basis for inferring that Schumacher was aware of the substantial risk of serious harm to Lary based on his change in condition.

Lary has, as such, failed to plead facts from which the Court might draw a reasonable inference that Schumacher was deliberately indifferent to his serious medical needs. Schumacher's motion to dismiss will be granted.

15

### C.    Skousen

Lary's claims against Skousen also fail.  Skousen had three encounters with (or about) Lary.  (*See supra*, at 2–6.)  On July 12, 2023, Skousen conducted a chronic care evaluation, where he learned about Lary's history of neuropathy and diabetes, observed Lary's difficulty walking, and noted no abnormal findings regarding Lary's feet.  Then, on July 16, 2023, Skousen responded to Lary's cell after one of his falls, noting trauma to his left foot and ordering him transferred to the medical unit for closer observation.[10]  Finally, on July 18, 2023, when Schumacher reported her concern that Lary had sepsis and possible necrosis, Skousen ordered Lary transferred to an emergency room.

Lary asserts that Skousen failed to provide timely medical treatment or to refer him to a higher-level provider.  (Dkt. No. 2-2 ¶¶ 173–74.)

#### 1.    Lary Does Not Allege a Failure to Properly Treat

Based on these facts, Lary does not allege any deliberately indifferent denial or delay in medical care on Skousen's part, nor was there the "functional equivalent" of a denial of treatment.  During Lary and Skousen's first interaction, Lary does not allege there was anything wrong with his foot.  During their second, Skousen ordered additional tests and had Lary transferred to the medical unit where his wound was cleaned and dressed.  Finally, when Skousen was informed of Lary's sepsis and potential necrosis, Skousen ordered transfer to an emergency room.  Each time Skousen saw Lary in a context where treatment was appropriate and/or sought, Skousen provided such treatment, and nothing Lary alleges indicates this treatment was the equivalent of no treatment at all.

---

[10] Skousen also ordered an ultrasound and x-ray that were not performed.

### 2.    Lary Does Not Allege a Failure in Gatekeeping

The complaint is similarly lacking as to any deliberate indifference in refusing to refer Lary to a higher-level provider.  Where a medical provider "orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted" under Tenth Circuit case law.  *Self*, 439 F.3d at 1232–33.  This is essentially what Skousen is alleged to have done.  He did not ignore symptoms evidencing a substantial risk of harm, nor did he fail to refer Lary to a higher level of care when such symptoms presented.  Skousen's motion to dismiss will be granted.

## IV.    Municipal Liability—Regalado and Turn Key

The Court next considers Lary's municipal liability claims against the institutional defendants.

### A.    The *Monell* Standard

Municipal entities are persons subject to liability under § 1983.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 688–90 (1978).  This includes counties and medical contractors like Regalado and Turn Key.[11]  *Lucas*, 58 F.4th at 1144.  Such entities "are responsible only for their own illegal acts and are not vicariously liable under § 1983 for their employees' actions." *George ex rel. Bradshaw v. Beaver Cnty.*, 32 F.4th 1246, 1253 (10th Cir. 2022) (citation modified).  Instead, to state a claim against a municipality, the plaintiff must plead facts showing "that (1) an official policy or custom (2) caused the

---

[11] Lary sues Regalado in his official capacity, which "is essentially another way of pleading an action against the county" he represents. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010).

plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *Id.*

Here, the second element—causation—is missing.

## B.    Causation

### 1.    The Policies at Issue

Lary alleges that Turn Key and Regalado have policies that incentivize under-prescribing medication and keeping inmates at the jail to avoid offsite medical costs. (*E.g.,* Dkt. No. 2-2 ¶¶ 98–103.)  Turn Key and Regalado also allegedly have a policy of allowing undertrained and under-supervised LPNs to run the medical unit at the jail and a policy of failing to regularly take vital signs.[12]  (*Id.* ¶¶ 105, 108 ("under Turn Key's medical delivery system, [LPNs and LPCs] are permitted to assess, evaluate and treat detainees with complex and serious medical . . . conditions, without direct supervision").

### 2.    The Scope of the Court's Causation Assessment

Considering the facts alleged in Lary's complaint, the Court finds that these policies are alleged in relation to the medical care Lary received after he became injured. Lary does not appear to allege any constitutional violation based on the fact of his initial injury, or that any policies caused such violation.  For instance, he does not allege that a failure to provide him a wheelchair or other assistive device was in furtherance of a policy that incentivized under-prescribing medicine or keeping inmates onsite for treatment, or that such failure violated the Constitution.  Nor does Lary allege that the care he received

---

[12] The complaint contains many more factual allegations supporting Lary's assertion that these policies exist and that the institutional defendants have been deliberately indifferent to their effects.  For purposes of this order, the Court assumes both the policy and deliberate-indifference elements have been alleged and focuses solely on the element of causation.

prior to his injury was deficient because LPNs were being permitted to "evaluate and treat" a "complex and serious medical condition[] without direct supervision." Finally, Lary makes no allegation that any failure to take vital signs caused his injury.

Thus, the Court limits its focus to determining whether the policies alleged caused a constitutional injury when Lary's foot wound became so dire that it necessitated amputation in a matter of days.

### 3.    Lary has Failed to Sufficiently Allege Causation

To hold a municipal entity liable, Lary must allege facts showing "an affirmative or direct causal link" between a policy and the deprivation of his federally protected rights. *Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010) (citation modified). Usually, this means the municipality must have engaged in unconstitutional conduct by implementing some unconstitutional policy, or that there was a constitutional violation by a municipal officer that was caused by the municipality's policy. *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1187, 1191 (10th Cir. 2020) (because "municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation"). But sometimes the constitutional violation may be committed by "the sum of multiple officers' actions taken pursuant to municipal policy," and, in these cases, "the municipality may not escape liability by acting through twenty hands rather than two." *Id.* at 1191; *see also Lucas*, 58 F.4th at 1144 ("while unusual, municipal liability may exist without individual liability: for example, for a systemic failure of medical policies and procedures"). Here, the causal link is missing

whether the Court looks to an individual officer's actions or the actions of the entity's employees as a whole.[13]

For example, Lary alleges a policy to under-prescribe medication, but he does not allege that he was harmed by the denial of any medication which was warranted or necessary under the known circumstances of his case. Lary also alleges a policy to avoid offsite medical care, but, at the same time, allows that he was moved offsite for emergency care after Schumacher observed possible necrosis on July 18, 2023. As noted above (*supra*, at 14–15), Lary does not allege facts from which the Court might infer that Schumacher could have known he needed such offsite care prior to that date. Further, Lary does not allege facts from which any combination of persons at the jail could have known he needed such offsite care, as there are no allegations that anyone else at the jail observed something Schumacher failed to see. And while Lary notes the gaps in his wound dressing and observation, he does not allege that these gaps were caused by Turn Key's policies or that, had additional observation occurred, the medical staff would have realized sooner that he was facing sepsis or necrosis.

Lary also alleges that too much of the medical unit was left to unsupervised LPNs, but he does not allege that a doctor—seeing everything that LPN Schumacher saw—would have had any reason to act differently than she did.

Finally, Lary alleges failures in taking vital signs, but he does not allege that his vital signs would have indicated the severity of the infection before July 18 or otherwise affected the apparentness of his need for additional care.

---

[13] Liability for a municipality's systemic failure of medical policies and procedures arises when deliberate indifference to serious medical needs results in "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 308 (10th Cir. 1985).

As such, Lary has failed to allege that any of the complained-of policies caused a constitutional violation against him.  Lary's claims against Turn Key and Regalado will be dismissed.

## Conclusion

IT IS THEREFORE ORDERED that *Defendant Sarah Schumacher, LPN's Motion to Dismiss* (Dkt. No. 24) is GRANTED; *Defendant Andrew Skousen, DNP's Motion to Dismiss* (Dkt. No. 23) is GRANTED; *Defendant Turn Key Health Clinic, LLC's Motion to Dismiss* (Dkt. No. 22) is GRANTED; and the *Motion to Dismiss of Defendant Vic Regalado* (Dkt. No. 26) is GRANTED.  Plaintiff's claims against all Defendants are DISMISSED WITHOUT PREJUDICE.  Plaintiff may move for leave to file an amended complaint within 14 days of this order.  If no motion is filed, judgment will be entered.

ORDERED this 29th day of July, 2026.

SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT